Slip Op. 20-11

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JIAXING BROTHER FASTENER CO., LTD. ET AL.,**<br><br>    **Plaintiffs,**<br><br>v.<br><br>**UNITED STATES,**<br><br>    **Defendant,**<br><br>**and**<br><br>**VULCAN THREADED PRODUCTS INC.,**<br><br>    **Defendant-Intervenor.** | **Before: Claire R. Kelly, Judge**<br><br>**Court No. 15-00313** |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the fifth administrative review of certain steel threaded wire rod from the People's Republic of China.]

Dated: January 29, 2020

<u>Gregory S. Menegaz</u>, <u>J. Kevin Horgan</u>, and <u>Alexandra H. Salzman</u>, deKieffer & Horgan, PLLC, of Washington, D.C., for plaintiffs Jiaxing Brother Fastener Co., Ltd., a/k/a Jiaxing Brother Standard Parts Co., Ltd., IFI & Morgan Ltd., and RMB Fasteners Ltd.

<u>Joseph H. Hunt</u>, Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant. With him on the brief were <u>Jeanne E. Davidson</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, and <u>Elizabeth Anne Speck</u>, Senior Trial Counsel. Of counsel was <u>Daniel Calhoun</u>, Assistant Chief Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Kelly, Judge: This action is before the court on a motion for judgment on the

agency record challenging several aspects of the U.S. Department of Commerce's

("Department" or "Commerce") final determination in the fifth administrative review of the

antidumping duty ("ADD") order covering certain steel threaded rod ("STR") from the

People's Republic of China ("PRC").  Certain [STR] from the [PRC], 80 Fed. Reg. 69,938 (Dep't Commerce Nov. 12, 2015) (final results of [ADD] admin. review & final determination; 2013-2014) ("Final Results") and accompanying Issues and Decision Memo. for the Final Results of the Fifth Administrative Review of the [ADD] Order on Certain [STR] from the [PRC], A-570-932, (Nov. 3, 2015), ECF No. 18-4 ("Final Decision Memo.").

Plaintiffs Jiaxing Brother Fastener Co., Ltd. (a/k/a Jiaxing Brother Standard Parts, Co., Ltd.), IFI & Morgan Ltd., and RMB Fasteners Ltd. (collectively, "Jiaxing") challenge three aspects of Commerce's final determination.  See Pls.' Memo. Supp. Mot. J. Agency R., May 31, 2019, ECF No. 43-2 ("Pls.' Br.").  Plaintiffs challenge as unsupported by substantial evidence Commerce's selection of Thailand as the primary surrogate country, see id. at 8–22, and the selection of GTA data from Thailand to value STR inputs, see id. at 23–26.[1]  Plaintiffs also challenge as unsupported by substantial evidence Commerce's decision not to adjust the surrogate financial ratios.  See id. at 27–28.

For the reasons that follow, the court sustains Commerce's selection of Thailand as the primary surrogate country and Commerce's selection of GTA data from Thailand. However, the court remands Commerce's determination regarding the calculation of surrogate financial ratios for further explanation or consideration.

---

[1] Although Plaintiffs in their moving brief characterize Commerce's decision as arbitrary and capricious and as contrary to law, in substance, Plaintiffs' arguments challenge the determination as unsupported by the record and therefore lacking substantial evidence.  See Pls.' Br. at 1, 3, 8. The court therefore addresses the Plaintiffs' arguments as substantial evidence arguments.

## BACKGROUND

On May 29, 2014, Commerce initiated the fifth administrative review covering STR entered during the period of review ("POR") April 1, 2013 through March 31, 2014. Initiation of Antidumping and Countervailing Duty Admin. Reviews, 79 Fed. Reg. 30,809, 30,813 (Dep't Commerce May 29, 2014).  Commerce selected Jiaxing as a mandatory respondent for this review.  See Certain [STR] from the [PRC], 80 Fed. Reg. 26,222, 26,222 (Dep't Commerce May 7, 2015) (preliminary results of the [ADD] review; 2013-2014) ("Preliminary Results"), and accompanying Decision Memo. for Prelim. Results of Fifth [ADD] Review, A-570-932, (Apr. 30, 2015), available at https://enforcement.trade.gov/frn/summary/prc/2015-11082-1.pdf (last visited Jan. 23, 2020) ("Preliminary Decision Memo.").

Given that Commerce considers the PRC to be a non-market economy ("NME"), Commerce calculated Jiaxing's dumping margin based on factors of production ("FOPs") by using prices from a surrogate market economy country ("primary surrogate country"). See 19 U.S.C. § 1677b(c)(4) (2012).[2]  On July 14, 2014, Commerce sought comments from interested parties on its selection of possible primary surrogate countries, which included South Africa, Colombia, Bulgaria, Thailand, Ecuador, and Indonesia.  See Request for Surrogate Country and Surrogate Value Cmts. and Information, PD 28, bar

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

code 3215368-01 (July 14, 2014) ("Commerce's Surrogate Country Request").[3]  In reply, Jiaxing proposed that Commerce also consider the Ukraine, and submitted additional information and data concerning that country.[4]  See Jiaxing Surrogate Country Selection Cmts. at 2, PD 66, bar code 3229776-01 (Sept. 19, 2014) ("Jiaxing SC Seln. Cmts."); see also Jiaxing Surrogate Value Information, PD 95–98, bar code 3239156-01 (Oct. 31, 2014) ("Jiaxing SV Info."); Jiaxing Rebuttal Factual Information, PD 100–01, bar code 3240415-01 (Nov. 7, 2014) ("Jiaxing SV Rebuttal").

On November 3, 2015, Commerce published its Final Results and selected Thailand as the primary surrogate country for the valuation of FOPs and surrogate financial ratios.  See Final Decision Memo. at 7–9, 45–56; see also Final Surrogate Value Memo., PD 275–79, bar code 3414832-01 (Nov. 3, 2015) ("Final SV Memo.").  Commerce explained that although it considered Ukraine and Thailand to be at a comparable level of economic development to the PRC in terms of per capita gross national income ("GNI") and to be significant producers of STR, steel import data for Thailand from the Global Trade Atlas ("Thai GTA data") was more specific than data from Ukraine.  Final Decision Memo. at 47–49, 52–55.  Specifically, the Thai GTA data, unlike data sources from the Ukraine, catalogued import prices by carbon content and diameter specific to the steel

---

[3] On January 11, 2016, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination, on the docket, at ECF No. 18-1-2.  Citations to administrative record documents in this opinion are to the numbers Commerce assigned to such documents in the indices.

[4] Jiaxing also proposed the Philippines as the primary surrogate country.  See Jiaxing SC Seln. Cmts. at 2; Final Decision Memo. at 46.  However, Commerce found that the Philippines was not at a comparable level of economic development as the PRC and therefore rejected the Philippines as a potential primary surrogate country.  See Final Decision Memo. at 47–48.

Court No. 15-00313                                                    Page 5

grade of Jiaxing's primary STR inputs, i.e., round bar and steel wire rod (collectively, "STR inputs").[5]  See id. at 53.  Commerce also considered the Thai GTA data to be more contemporaneous than the Ukrainian data and, further, found that only Thailand "offer[ed] multiple financial statements that mirror the production experience of [Jiaxing.]"  Id. at 53, 56.  Given that, in Commerce's view, "Thailand offers superior quality of data for the surrogate financial ratios" and the foregoing considerations, Commerce selected Thailand as the primary surrogate country.  Id. at 56.  Commerce also selected the Thai GTA data to value Jiaxing's STR inputs and used the financial statements from two Thai companies to calculate surrogate financial ratios.  Id. at 59, 61–66.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in a review of an antidumping duty order. The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

---

[5] As Commerce explained, "[STR] is drawn from wire rod or round bar, [and] these steel inputs constitute most of the material cost and are the most important factors for surrogate country selection purposes in proper valuation of [STR]."  Final Decision Memo. at 52 (citing Final SV Memo. at Ex. 1).

## DISCUSSION

### I.  Primary Surrogate Country Selection

Jiaxing challenges as unsupported by substantial evidence Commerce's selection of Thailand as the primary surrogate country because Commerce did not consider evidence that Thai GTA data are distorted and failed to understand the quality of the Ukrainian data.  See Pls.' Br. at 8–22.[6]  Defendant argues that there is substantial evidence supporting Commerce's selection of Thailand as the primary surrogate country. See Def.'s Br. at 8–22.  For the reasons that follow, the court sustains Commerce's selection of Thailand as the primary surrogate country.

In an antidumping proceeding, if Commerce considers an exporting country to be an NME, like the PRC, it will identify one or more market economy countries to serve as a "surrogate" for that NME country in the calculation of normal value.[7]  See 19 U.S.C. § 1677b(c)(1), (4).  Normal value is determined on the basis of FOPs from the surrogate country or countries used to produce subject merchandise.  See id. at § 1677b(c)(1). FOPs to be valued in the surrogate market economy include "quantities of raw materials employed," "amounts of energy and other utilities consumed," "representative capital cost,

---

[6] Jiaxing also contends that a "much higher standard" applies when Commerce reviews and selects surrogate values.  See Pls.' Br. at 1.  However, Jiaxing does not cite support for this proposition or elaborate further in its briefs.  Therefore, the court does not understand Jiaxing to be making a contrary to law argument.

[7] Dumping occurs when merchandise is imported into the United States and sold at a price lower than its "normal value," resulting in material injury (or the threat of material injury) to the U.S. industry.  See 19 U.S.C. §§ 1673, 1677(34), 1677b(a).  The difference between the normal value of the merchandise and the U.S. price is the "dumping margin."  See 19 U.S.C. § 1677(35).  When normal value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping margin are imposed to offset the dumping.  See 19 U.S.C. § 1673; see generally Dorbest Ltd. v. United States, 604 F.3d 1363, 1367 (Fed. Cir. 2010).

including depreciation[,]" and "hours of labor required[.]"    See id. at § 1677b(c)(3).

However, the statute does not distinguish between production labor, or labor used to

produce subject merchandise, and non-production labor, or labor associated with selling,

general, and administrative ("SG&A") functions.    See generally Dorbest Ltd. v. United

States, 604 F.3d 1363, 1368 (Fed. Cir. 2010).  After calculating the total value of FOPs,

Commerce will add "an amount for general expenses and profit plus the cost of

containers, coverings, and other expenses."    19 U.S.C. § 1677b(c)(1).    To do so,

Commerce calculates "surrogate financial ratios" that the agency derives from the

financial statements of one or more companies that produce identical or comparable

merchandise in the primary surrogate country.  See 19 C.F.R. § 351.408(c)(4) (2015);

Dorbest, 604 F.3d at 1368.

By statute, Commerce must value FOPs "to the extent possible . . . in one or more

market economy countries that are . . . at a level of economic development comparable

to that of the [NME], and . . . significant producers of comparable merchandise."  19 U.S.C.

§ 1677b(c)(4)(A)–(B).[8]   When several countries are both at a level of economic

development comparable to the NME country and significant producers of comparable

merchandise, Commerce evaluates the reliability and completeness of the data in

similarly situated surrogate countries and generally selects the one with the best data as

the primary surrogate country.  See Import Admin., U.S. Dep't Commerce, Non-Market

---

[8] This analysis is designed to determine a producer's costs of production in an NME as if that producer operated in a hypothetical market economy.  See, e.g., Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d 1369, 1375 (Fed. Cir. 2015); Nation Ford Chemical Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999); see also 19 U.S.C. § 1677b(c)(1).

Economy Surrogate Country Selection Process, Pol'y Bulletin 04.1 (2004), available at

http://enforcement.trade.gov/policy/bull04-1.html (last visited Jan. 23, 2020) ("Policy

Bulletin 04.1"). Commerce prefers to use one primary surrogate country. See 19 C.F.R.

§ 351.408(c)(2).

Further, section 1677b requires Commerce to use "the best available information"

to value FOPs.  19 U.S.C. § 1677b(c)(1).  Commerce has discretion to determine what

constitutes the best available information.  QVD Food Co. v. United States, 658 F.3d

1318, 1323 (Fed. Cir. 2011).  "Commerce generally selects, to the extent practicable,

surrogate values that are publicly available, are product-specific, reflect a broad market

average, and are contemporaneous with the period of review" (collectively, "selection

criteria").  Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir.

2014); see also Policy Bulletin 04.1.

An agency's determination is supported by substantial evidence when there is

"such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003)

(quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The "substantiality of

evidence must take into account whatever in the record fairly detracts from its weight."

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).  Nevertheless, "the

possibility of drawing two inconsistent conclusions from the evidence does not invalidate

Commerce's conclusion as long as it remains supported by substantial evidence on the

record."  Zhaoqing New Zhongya Aluminum Co., Ltd. v. United States, 36 CIT 1390, 1392,

887 F. Supp. 2d 1301, 1305 (2012) (citing Universal Camera Corp., 340 U.S. at 488).

Commerce's selection of Thailand, over Ukraine, as the primary surrogate country is supported by substantial evidence, because Thailand was the only country for which Commerce had steel-grade specific values that could be matched to Jiaxing's low-carbon STR inputs—i.e., wire rod and round bar—as well as financial statements that were fully contemporaneous with the POR. See Final Decision Memo. at 45–56. Although Commerce found Ukraine, like Thailand, to be "within the GNI band of countries that are considered to be at the same level of economic development to the PRC" and to be a significant producer of STR, thus satisfying the statutory requirements under section 1677b(c)(4)(A)–(B),[9] Commerce, in comparing data sources from Thailand and the Ukraine reasonably found that data from Thailand were the "best available information" on the record. See id. at 47, 49–56; see also 19 U.S.C. § 1677b(c)(4)(A)–(B).

First, Commerce compared Thai and Ukrainian data sources to value STR inputs, i.e., wire rod and round bar. See Final Decision Memo. at 52–55. Specifically, Commerce considered three possible data sources, GTA data from Thailand, GTA data from the Ukraine, and Metal Expert data from the Ukraine. Id. at 53–55. Commerce found that the Thai GTA data was divided by grades of steel based on carbon content and reported

---

[9] Commerce also determined that Bulgaria, Colombia, Ecuador, Indonesia, and South Africa were economically comparable to the PRC and significant producers of comparable merchandise; however, no party placed information from these countries on the record or argued that any should be selected as the primary surrogate country. See Final Decision Memo. at 46–47, 50. Instead, interested parties submitted information on Thailand and the Ukraine. Id. at 50.

at the ten-digit HTS level.[10]  Id. at 53.  The Ukrainian GTA data, by contrast, was organized in "broad basket categories" and reported at the eight-digit HTS level.  Id.; see also Jiaxing SV Info. at Ex. SV-5.  Although Commerce found that the Ukrainian and Thai GTA data both "provide[d] specific breakouts for carbon content and diameter that is specific to the grade of [Jiaxing's] steel input" for wire rod, the Thai GTA data was more specific to value round bar.[11]  See Final Decision Memo. at 53.  Commerce also compared Thai GTA data with Metal Expert data from the Ukraine.  See id. at 54.  Commerce found that the Ukrainian Metal Expert data was as "specific to the diameter for the grade of steel wire rod and round bar" as the Thai GTA data.  Id.  Commerce also found the two data sources to be equal in terms of "public availability, specificity, tax exclusivity, and broad market average representation"—but not in terms of contemporaneity.  Id.  The Ukrainian Metal Expert data covered only April 2013, one month of the POR, unlike the Thai GTA data.  Id.[12]

---

[10] Jiaxing consumed low-carbon steel in its production of STR and reported specific carbon content ranges.   See Final Decision Memo. at 52–53; see also Jiaxing's Supp. Sec. D. Questionnaire Resp. Resubmission, CD 158–60, bar code 3257803-01 (Feb. 5, 2015); Jiaxing's Supp. Sec. C Questionnaire Resp., CD 97–98, bar code 3246816-01 (Dec. 12, 2014).

[11] Commerce explained that the Thai data "are specific to the percentage of carbon content and diameter of the grade for the . . . steel input[.]"  Final Decision Memo. at 53.  The Ukrainian data was not subdivided by carbon content and less specific to value round bar.  Id.

[12] Jiaxing argues that "the specificity of the Thai steel round bar carbon content is critically less important" in selecting the primary surrogate country, because over 95% of steel purchased and consumed by Jiaxing was wire rod.  Pls.' Br. at 22.  This argument ignores Commerce's other regulatory preferences to select SV data that is fully contemporaneous with the POR.  See Policy Bulletin 04.1.  Commerce examines all SV selection criteria—public availability, contemporaneity with the POR, representation of a broad market average, tax and duty-exclusive, and specific to the input—and prefers to select data that meet all criteria.  See, e.g., Issues and Decision Memo. for 6th Admin. Review Certain Preserved Mushrooms from the [PRC] at 3, A-570-851, (July 5, 2006), available at  https://enforcement.trade.gov/frn/summary/prc/E6-11276-1.pdf (last visited Jan. 23, 2020).

Second, Commerce evaluated financial statements from Thai and Ukrainian companies. Id. at 55–56. Jiaxing had placed on the record financial statements of a Ukrainian company, dating to 2011, which precedes the POR; and, petitioners submitted 2013 financial statements from Thai producers of comparable merchandise that were contemporaneous with the POR. See id. at 56.[13] Commerce, again consistent with its preference to select data that satisfy all its selection criteria, including contemporaneity with the POR, chose to rely upon financial statements from Thai companies. See id. Therefore, given the inputs to be valued, and in consideration of the record evidence, Commerce determined that the data from Thailand was the "best available information" to value Jiaxing's FOPs.

Jiaxing does not demonstrate that Commerce failed to consider detracting evidence regarding the alleged distortion of Thai import values due to the Thai custom's authority's valuation practice. Jiaxing points to several reports from the United States Trade Representative ("USTR"), U.S. companies, and the Department itself concerning the Thai customs authority's customs valuation practices that "indicate the pervasiveness of this practice" that is not "confined to certain types of commodities[.]"[14] See Pls.' Br. at

---

[13] Commerce found that the four financial statements on the record from Thai companies to be "publicly available, complete, and audited." See Final Decision Memo. at 62.

[14] Jiaxing further contends that "the Department should take more seriously information indicating it has reason to believe or suspect the Thai Custom's data is being manipulated" given that Commerce rejects financial statements of surrogate companies that receive subsidies. See Pls.' Br. at 19. According to Jiaxing, both customs value manipulation and subsidization "speak[] to fundamentally the same issue: government involvement in pricing." Id. However, Congress specifically directed Commerce to "avoid using any prices which it has reason to believe or

(footnote continued)

10–14; see also Jiaxing SV Rebuttal at Exs. SV–2–12.  However, none of the reports, as Commerce explains and Jiaxing concedes, specify that the Thai customs authority manipulates the customs valuation of STR imports.[15]  See Final Decision Memo. at 51; Pls.' Br. at 14.  Commerce, in considering the reports' general discussion on alleged customs valuation manipulation, did not find them to render unreliable the Thai GTA data on the record.  See Final Decision Memo. at 51.  Commerce addressed Jiaxing's

---

suspect may be dumped or subsidized prices."  Omnibus Trade and Competitiveness Act of 1988, Conference Report to Accompany H.R. 3, H.R. Rep. No. 100–576 at 590–91 (1998) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1623–24.  Commerce, by its regulations, rejects data tainted by subsidization.  See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,366 (Dep't Commerce May 19, 1997) (final rule).  Jiaxing has not established why Commerce acted unreasonably in declining to fault the Thai data on the basis of alleged manipulation, when Congress has not spoken to the issue and Commerce's regulations do not compel rejection.

[15] The reports are the USTR's annual "National Trade Estimate Report on Foreign Trade Barriers" for the years 2011–2014, a publication by Commerce's U.S. Commercial Service entitled "Doing Business in Thailand: 2012 Country Commercial Guide for U.S. Companies," a country profile of Thailand prepared by FedEx in 2013, and two requests for consultations filed with the World Trade Organization ("WTO") in 2008.  See Jiaxing SV Rebuttal at Exs. SV–2–11.  Each raises general concerns about the customs valuation practices of Thai customs authority.  For example, although there are differences between the USTR's annual reports, each has a substantially similar section on "Customs Barriers" that, in each, conveys the (substantially same) concerns:

> The United States continues to have serious concerns about the lack of transparency in the Thai customs regime and the significant discretionary authority exercised by Customs Department officials. . . . The U.S. Government and industry also have expressed concern about the inconsistent application of Thailand's transaction valuation methodology and reports of repeated use of arbitrary values by the Customs Department.

Id. at Ex. SV-5; see also id. at Exs. SV–2–4.  Commerce's 2012 "Doing Business in Thailand" publication echoes these concerns from the USTR reports.  See id. at Ex. SV-6.  The FedEx profile of Thailand reports that Thai customs officials will regularly assess import values through use of an indicative price prepared from the highest declared price of previous shipments of a product instead of the actual transaction value.  See id. at Ex. SV-11.  The two requests for consultations for WTO dispute settlement were filed by the European Union and the Philippines, alleging that Thailand has, since 2006, been applying arbitrary customs values to certain imports of alcoholic beverages and cigarettes, respectively.  See id. at Exs. SV-7–8; see also id. at Ex. SV-9.  None of these reports raise specific allegations as to the treatment of STR imports into Thailand by the Thai customs authority.

arguments in the underlying proceeding concerning these reports, and it is not the court's role to reweigh or itself reassess the credibility of that evidence.[16]  See Downhole Pipe & Equipment, L.P., 776 F.3d at 1376 (explaining that the court's task is not to reweigh the evidence).

Nor does Jiaxing persuade that Commerce erred by failing to consider the reports in conjunction with record evidence on Thai steel import prices.  Jiaxing argues, that given Thailand's import values for STR were at least 35% higher than world prices, this fact "lends specific factual support" to the reported concerns about the Thai customs authority's manipulation of import values with respect to STR.[17]  See Pls.' Br. at 14.  In making this argument, Jiaxing draws a parallel to Jacobi Carbons AB v. United States, 42

---

[16] According to Jiaxing, Commerce did not have a choice "between two competing datasets with various advantages and disadvantages" because data from Thailand "is distorted—and thus fatally flawed."  See Pls.' Reply Br. at 1.  As explained above, Commerce reasonably found that Jiaxing did not adduce evidence of alleged manipulation of STR imports by the Thai customs authority that amounted to distortion.

[17] Jiaxing also points to 14 other data sources on the record to value STR inputs, which are "at least 35% lower on average than the Thai [GTA import values,]" that suggest the Thai GTA data aberrant and not the best available information.  Pls.' Br. at 20–22 (citing Jiaxing SV Rebuttal); see also Pls.' Reply Br. at 6–7.  However, Jiaxing did not place on the record evidence Commerce generally considers in determining aberrancy, namely input prices from the POR and prior years from countries comparable by GNI to the NME.  See, e.g., Issues & Decision Memo. for the Final Results in the Admin. Review of Certain Preserved Mushrooms from the [PRC] at 9–11, A-570-851, (Sept. 4, 2012), available at https://enforcement.trade.gov/frn/summary/prc/2012-22353-1.pdf (last visited Jan. 23, 2020).  Moreover, as Commerce noted, data is not aberrational because it is the lowest or highest data on the record.  Final Decision Memo. at 55 (citing Camau Frozen Seafood Processing Import Export Corp. v. United States, 37 CIT __, __ n.9, 929 F. Supp. 2d 1352, 1356 n.9 (2013)).  Jiaxing further contends that the lower Thai domestic data sources are "particularly probative," because a Thai producer of STR would "not pay significantly inflated import prices when it could obtain such commodity steels from numerous other domestic sources at a lower cost."  Pls.' Br. at 21.  Commerce considered and reasonably rejected each of these third-country data sources along with the Thai domestic data, because they were not specific to the type of low-carbon STR Jiaxing consumed.  See Final Decision Memo. at 55.  Further, although a surrogate value must be representative of the situation in the NME country, Commerce had no obligation to duplicate the exact production experiences of Thai STR manufacturers.  See e.g., National Ford Chemical Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

CIT __, 313 F. Supp. 3d 1308 (2018).  See Pls.' Br. 15–16; see also Pls.' [Jiaxing] Reply

Br. at 4–6, Oct. 9, 2019, ECF No. 49 ("Pls.' Reply Br.").  However, Jiaxing's reliance is

misplaced.  In Jacobi Carbons, the court concluded that Commerce selection of Thai

surrogate values was not supported by substantial evidence and inadequately explained.

See 313 F. Supp. 3d at 1338.  The court explained that record evidence regarding the

manipulation of customs data together with high Thai prices suggested possible

aberrancy.  See id. at 1334–38.  That decision, on a different record, concerns a different

question of substantial evidence, whether Commerce's selection of a surrogate value was

reasonable.  See id. at 1332–38.  The answer to that question is not probative of whether

Commerce's selection of a primary surrogate country is, on this record, supported by

substantial evidence.  Therefore, Commerce reasonably selected Thailand as the primary

surrogate country because it offered the "best available information."

## II.  Selection of Surrogate Values

Jiaxing contends that, assuming Commerce appropriately selected Thailand as the

primary surrogate country, Commerce should have rejected the Thai GTA data to value

Jiaxing's STR inputs.  Pls.' Br. at 24.  Jiaxing argues that the Thai GTA data is not the

"best available information," given that domestic price sources on the record are

"consistently and considerably lower" than the GTA data.  Id. at 23.  Instead, Commerce,

according to Jiaxing, should have relied on one of the Thai domestic data sources on the

record.[18]  Id. at 24.  Defendant responds that Commerce's selection of the Thai GTA data is supported by substantial evidence and Commerce sufficiently explained why the domestic price sources failed to satisfy its surrogate value selection criteria.  Def.'s Br. at 22–25.  For the reasons that follow, the court sustains Commerce's selection of Thai GTA data to value Jiaxing's STR inputs.

As explained above, section 1677b requires Commerce to use "the best available information" to value FOPs.  19 U.S.C. § 1677b(c)(1).  Commerce will generally select surrogate values from the primary surrogate country that are publicly available, product-specific, and contemporaneous with the period of review, as well as reflect a broad market average.  Qingdao Sea-Line Trading Co., 766 F.3d at 1386 (Fed. Cir. 2014); see also Policy Bulletin 04.1.

Commerce reasonably selected Thai GTA data to value Jiaxing's STR inputs, because it was the only data on record that was fully contemporaneous with the POR and was the most specific to the diameter of wire rod and carbon content consumed by Jiaxing than other record data.  See Final Decision Memo. at 58–59.  Commerce compared the Thai GTA data with two other data sources on the record, i.e., Thai domestic wire rod prices from the Asian Metal Market, and domestic and export prices from TATA Steel (Thailand).  Id. at 58.  With respect to the Asian Metal Market data, Commerce explained

---

[18] According to Jiaxing, Commerce has a "preference" for domestic data when "import value is significantly higher than domestic price."  Pls.' Br. at 24.  Jiaxing refers to Hebei Metals & Materials Imp. & Exp. Corp. v. United States as support for this preference; however, in that case, the court explained that although Commerce may prefer a surrogate country's domestic prices over import values, that preference does not trump all other considerations "where it would conflict with the goal of accuracy."  29 CIT 288, 299, 366 F. Supp. 2d 1264, 1274 (2005).

that the data were neither contemporaneous with the POR[19] nor specific, given that Jiaxing reported usage of a much wider range of diameter than the three steel wire rod diameters reported by Asian Metal Market.  See Final Decision Memo. at 59.  With respect to data from TATA Steel (Thailand), Commerce focused on the report's domestic prices, rather than the export prices, because Commerce considered that the export sales data likely reflected price distortion due to "the Department's affirmative finding that Thai [STR] industry is dumping to the United States[.]"  See id. at 58.  Commerce also rejected the TATA Steel (Thailand) domestic price data, because it did not represent a broad-market average, given that the data reflect the experiences of a single company, and only covered a narrow range of medium- and low-carbon wire rod of a single diameter.  See id.[20]  Neither the Asian Metal Market nor TATA Steel (Thailand) data satisfied Commerce's selection criteria, unlike the Thai GTA data.[21]  See Final Decision Memo. at 57–58.  Therefore, Commerce reasonably rejected the former two data sources in favor of the latter to value Jiaxing's STR inputs.  Id. at 58.

---

[19] Jiaxing concedes that the Asian Metal Market data "is not contemporaneous" with the POR. Pls.' Br. at 26.  To remedy this deficiency, Jiaxing suggests that Commerce "us[e] the price index to inflate the values."  Id.  Jiaxing does not cite to any authority as support requiring Commerce to inflate values.

[20] Commerce also explained that the TATA Steel (Thailand) domestic prices were "quotes . . . offered as a price for export" that could, therefore, be distorted by Thai export subsidies.  Final Decision Memo. at 58.

[21] Commerce explained that the GTA data from Thailand "provide better coverage" for the type of STR reported by Jiaxing, in terms of diameter and carbon content, and were fully contemporaneous with the POR.  Final Decision Memo. at 59 (citing Final SV Memo. at 3).

### III. Adjustment of Financial Ratios

Jiaxing challenges how Commerce accounted for labor in its normal value calculation.  Specifically, Jiaxing points to certain labor-related line items categorized under "selling and administration costs" in the surrogate financial statements[22] and alleges that Commerce, in its surrogate financial ratio calculations, improperly treated these line items ("SG&A labor-related line items") as SG&A expenses rather than labor costs.  See Pls.' Br. at 27.  As a result, Jiaxing claims that Commerce erroneously double-counted labor costs, because Commerce's valuation of hours of labor reflected all labor costs, inclusive of the SG&A labor-related line items.  Pls.' Br. at 27; Pls.' Reply Br. at 9–11.  Defendant responds that Jiaxing's argument is without merit, because Commerce cannot "go behind" a surrogate financial statement to, as Jiaxing urges, re-categorize the SG&A labor-related line items, that in Commerce's view, the surrogate companies identified as SG&A.  Def.'s Resp. Br. at 25–29.  Defendant further contends that Commerce was not required to adjust the surrogate financial ratios because the labor costs in the normal value calculation are not overstated.  Id. at 28.  For the reasons that follow, the court remands for further explanation or consideration Commerce's calculation of the surrogate financial ratios related to labor.

As explained above, Commerce determines "normal value . . . on the basis of [FOPs]," including "hours of labor," to which Commerce "add[s] an amount for general expenses and profit[.]"  19 U.S.C. § 1677b(c)(1). Thus, section 1677b(c)(1) provides for

---

[22] The surrogate financial statements categorized the line items at issue under the headings "Selling Expenses" and "Selling and Administration Cost," referred collectively here as "selling and administration costs."  See Final SV Memo. at Ex. 13.

the separate valuation of the hours of labor FOP and of general expenses and profit in

the normal value calculation.  See id.  To value hours of labor, Commerce generally relies

on labor costs reported in the International Labor Organization's ("ILO") Chapter 6A data,

unless another data source better accounts for direct and indirect labor costs.  See

Antidumping Methodologies in Proceedings Involving [NMEs]: Valuing the [FOP]: Labor,

76 Fed. Reg. 36,092 (Dep't Commerce June 11, 2011) ("Labor Methodologies").[23]  To

value general expenses and profit, Commerce calculates surrogate financial ratios from

financial statements of one or more producers of comparable merchandise in the primary

surrogate country to capture certain items used in the production of subject merchandise.

See 19 C.F.R. § 351.408(c)(4); Dorbest, 604 F.3d at 1368.  Specifically, Commerce

calculates separate surrogate financial ratios for SG&A, manufacturing overhead, and

profit from a surrogate financial statement.  See, e.g., Manganese Metal From the [PRC],

64 Fed. Reg. 49,447, 49,448 (Dep't Commerce Sept. 13, 1999) (final results of second

admin. review).  To do so, Commerce analyzes each financial statement line item and

either assigns the line item value to a particular category—i.e., raw materials, labor,

energy, manufacturing overhead, finished goods, and profit—or excludes the value from

its calculation.  See, e.g., Final SV Memo. at Ex. 13.  Commerce then calculates separate

---

[23] Commerce originally valued labor hours with ILO Chapter 5B data, which only captured direct labor costs.  See Labor Methodologies, 76 Fed. Reg. at 36,093.  In its Labor Methodologies, Commerce announced that it would, instead, use ILO Chapter 6A data, because the ILO Chapter 5B data could result in an undercounting of indirect labor costs, if indirect labor costs were not itemized—and reflected in—surrogate financial ratios.  See id.  However, the effect of switching from data that reflected only direct labor costs to a source that reflected both indirect and direct labor costs, could result in an overstatement of labor costs.  To minimize this risk, Commerce stated that it will "adjust the surrogate financial ratios when the available record information—in the form of itemized indirect labor costs—demonstrates that labor costs are overstated."  Id. at 36,094.

surrogate financial ratios—for manufacturing overhead, SG&A, and profit—based on the total value of each category.  See id.; see also Manganese Metal From the [PRC], 64 Fed. Reg. at 49,448.  As relevant here, to calculate the SG&A surrogate financial ratio, Commerce divides the total SG&A value (numerator) by the total cost of manufacturing (denominator), i.e., the sum of raw materials, labor, energy, manufacturing overhead, and finished goods.  See, e.g., Final SV Memo. at Ex. 13; see also Manganese Metal From the [PRC], 64 Fed. Reg. at 49,448.

Commerce will make adjustments to the calculation of surrogate financial ratios to avoid double-counting[24] labor costs, "when the available record information—in the form of itemized indirect labor costs—demonstrates that labor costs are overstated."  See Labor Methodologies, 76 Fed. Reg. at 36,094; see also Issues & Decision Memo. for the Final Determination of the [ADD] Investigation of Drawn Stainless Steel Sinks from the [PRC] at 15, A-570-983, (Feb. 19, 2013), available at https://enforcement.trade.gov/frn/summary/prc/2013-04379-1.pdf (last visited Jan. 23, 2020) ("Stainless Steel Sinks IDM") (stating that "because the NSO data include all labor costs, the Department has treated itemized SG&A labor costs in the surrogate financial statements as a labor expense rather than an SG&A expense, and we have excluded those costs from the surrogate financial ratios").  In such a case, Commerce will determine whether the surrogate financial statements "include disaggregated overhead and [SG&A] expense items that are already included in the [record data used to value labor],

---

[24] Generally, double counting is disfavored in antidumping calculations because it is distortive and renders margins less accurate.  See, e.g., Zhaoqing Tifo New Fibre Co. v. United States, 41 CIT __, __ n.8, 256 F. Supp. 3d 1314, 1319 n.8 (2017) (collecting cases).

[Commerce] will remove these identifiable costs items."  See Labor Methodologies, 76 Fed. Reg. at 36,094.

Here, Commerce valued hours of labor with data from the National Statistical Office of Thailand's Labor Force Survey of the Whole Kingdom from the second and third quarters of 2013 ("NSO quarterly data"), because it found the data to be more industry-specific and contemporaneous with the POR than the ILO Chapter 6A data.[25]  See id. at 60, 65; see also Final SV Memo. at Exs. 8–9.[26]  Further, Commerce derived surrogate financial ratios from the financial statements of three Thai companies.[27]  See Final Decision Memo. at 56.  Each company's financial statements itemized production labor costs separately from non-production labor, which were categorized under "selling and administration costs."  See Final SV Memo. at Ex. 13.  In the calculation of surrogate financial ratios, Commerce categorized  SG&A labor-related line items as SG&A.  It did not, as Jiaxing urged during the administrative proceeding, reclassify the SG&A labor-related line items—such as salary, welfare, and social security—as labor.  See Final Decision Memo. at 64–66.  As a result, the SG&A surrogate financial ratio numerators included these line items' values, along with other SG&A expenses; and, the

---

[25] Commerce, in line with its Labor Methodologies, opted to use the NSO quarterly data, because the NSO quarterly data was more product-specific and contemporaneous than the ILO Chapter 6A data.  See Final Decision Memo. at 60, 65; see also Labor Methodologies, 76 Fed. Reg. at 36,093.

[26] The NSO quarterly data is contained in Exhibits 8 and 9.  See Final SV Memo. at Exs. 8–9; see also Vulcan's SV Information at Ex. 6, PD 93–94, bar code 3238953-01 (Oct. 31, 2014).

[27] Those three companies are: L.S. Industry Co., Ltd., Thai Mongkol Fasteners Co., Ltd., and Sahasilp Rivet Industrial Co., Ltd.. Final Decision Memo. at 56.

denominators contained, inter alia, other labor costs.[28]  See Final SV Memo. at 9 & Ex.
13.

Commerce's determination not to adjust the surrogate financial statements is
inadequately explained and does not appear to be supported by record evidence.  First,
Commerce found that the NSO quarterly data to value hours of labor "do not include
SG&A labor because . . . [the data] identifies individual data line items for 'manufacturing'
and 'administrative and support activities.'"  Final Decision Memo. at 65.  Commerce
noted that, because the NSO quarterly data did not encompass SG&A labor, it would
decline to adjust the surrogate financial ratios to reclassify the SG&A labor-related line
items as labor.  See id.  However, it is unclear on what basis Commerce determined that
the NSO quarterly data is exclusive of SG&A labor, because the NSO quarterly data only
identify individual data line items for "manufacturing" activities, and there is no reference
to "administrative and support activities" as Commerce stated in the Final Decision Memo.
See SV Memo. at Exs. 8–9; Final Decision Memo. at 65.  Although Commerce notes that
it relies on the same NSO quarterly data to calculate labor hours as in the previous
administrative review, see Final Decision Memo. at 65–66, the records of the two
proceedings are not the same.[29]   Here, unlike the previous administrative review, the

---

[28] Had Commerce instead categorized these line items as labor, and  placed the values in the
denominator, the resulting surrogate financial ratio would have been less than what Commerce
calculated.

[29] Each of Commerce's proceedings are treated "as independent proceedings with separate
records and which lead to independent determinations."  See E.I. DuPont De Nemours & Co. v.
United States, Slip. Op. 98–7, 22 CIT 19, 32 (1998).   Likewise, judicial review of such
determinations must be limited to the record before the agency that was compiled during that
segment of the proceeding.  See QVD Food Co., Ltd. v. United States, 658 F.3d 1318, 1324–25
(Fed. Cir. 2011).

record contains only excerpted data, not the full NSO reports.[30]  The agency must make its determinations based on the record before it.[31]   On this record, Commerce's determinations that the NSO quarterly data does not cover SG&A labor, and as a consequence, that no adjustment of the surrogate financial ratios is warranted, does not find support.

Further, in declining to adjust the surrogate financial ratios, Commerce offers a second rationale, its inability to "go behind" a surrogate company's financial statement, a practice where Commerce declines to adjust surrogate financial statements that do not

---

[30] By teleconference with the parties, the court requested the parties to indicate whether, and where, the complete NSO reports were on the record.  See Telephone Conference, Dec. 16, 2019, ECF No. 56.  In reply, Defendant and Defendant-Intervenor pointed to the excerpted NSO quarterly data.  See Def.'s Resp. Ct.'s Request for Information, Dec. 17, 2019; [Def.-Intervenor's] Resp. Ct.'s Request for Information, Dec. 17, 2019, ECF No. 58.  Plaintiffs, after reviewing the record, responded that "it was mistakenly presumed that the complete quarterly [Thai NSO data] was on the record . . . The submission of this labor data contained only an excerpt . . . with a webpage link to the full report."  Pls.' Resp. Ct.'s Request for Information, Dec. 17, 2019, ECF No. 59.

[31] In its Final Results, Commerce, however, assumes that the NSO quarterly data presented in this review was the same as in the prior review.  For example, Commerce states that the Thai quarterly data "do not include SG&A labor because the Department previously found this labor source identifies individual line items for 'manufacturing' and 'administrative and support activities'" but cites, as support, to an exhibit containing 2012 census data, which Commerce declined to use, and the Issues and Decision Memo. from the prior administrative review.  See Final Decision Memo. at 65 n.345.  In addition, Commerce summarizes the methodology by which the NSO quarterly data were collected in the Final Calculation Memo, see Final Calc. Memo. at 6, but that methodology appears nowhere in the record.

Plaintiffs, in their briefs, also assume that the records of this proceeding and the prior administrative proceeding are the same.  Specifically, Plaintiffs quote Jiaxing I at length, where the court explained how Commerce failed to address detracting evidence that suggest the NSO quarterly data encompasses more than manufacturing-related labor, and argue that the same reasoning applies here.  See Pl.'s Br. at 28; Pl's Reply Br. at 9–10.  However, the NSO data referenced here, and on the record in Jiaxing I, is not on this record.

disaggregate expenses.[32]    See Final Decision Memo. at 64.   Yet the support that

Commerce cites for this practice confirms that Commerce treats a surrogate financial

statement's itemized SG&A labor line items as a labor expense rather than an SG&A

expense so to avoid double-counting.    See id. at 65 n.340 (citing Stainless Steel Sinks

IDM).[33]  Here, the surrogate companies' financial statements itemized all expenses.  See

Final SV Memo. at Ex. 13.  Therefore, this practice appears to have no bearing, here, on

Commerce's valuation of labor costs in normal value and, moreover, runs against its

---

[32] Commerce prefers to accept surrogate financial statement line items as listed, because the Department generally lacks the information necessary to alter line items of a surrogate company as if it were the respondent under review.  When a surrogate financial statement does not list specific expenses, it is Commerce's practice not to "go behind" those financial statements and make adjustments, because, doing so, may introduce distortions.  See, e.g., Issues and Decision Memo. for the [ADD] Investigation of Certain Coated Paper Suitable for High Quality Print Graphics Using Sheet-Fed Presses from the [PRC]: Final [ADD] Determination at 72, A-570-958, (Sept. 20, 2010), available at https://enforcement.trade.gov/frn/summary/prc/2010-24159-1.pdf (last visited Jan. 23, 2020) (declining to exclude line items when the financial statement did not segregate specific types of expenses);   Issues and Decision Memo. for the Final Results of the Admin. Review of the [ADD] Order on Wooden Bedroom Furniture from the [PRC] at 35, A-570-890, (Aug. 5, 2011), available at https://enforcement.trade.gov/frn/summary/prc/2011-20434-1.pdf (last visited Jan. 23, 2020) (declining to adjust financial statements by applying a packing materials ratio when the companies did not separately report a packing material expense); see also Dongguan Sunrise Furniture Co., Ltd. v. United States, 36 CIT 860, 888, 865 F. Supp. 2d 1216, 1244 (2012) (sustaining Commerce's decision not to exclude selling costs from surrogate financial statement to match respondent's exact expenses).  The practice "serve[s] the goal of balancing increasing accuracy against the danger of introducing distortions in cases where either the difference between NME and ME producers or differences between the nationality of producers would make line-by-line comparisons misleading."  Thai Plastic Bags Industries Co., Ltd. v. United States, 37 CIT __, __, 949 F. Supp. 2d 1298, 1306 (2013).  However, where there is information on the record to exclude certain expenses to avoid double-counting in the normal valuation calculation, Commerce will exclude those line items.  See, e.g., Issues and Decision Memo. for the [ADD] Investigation of Certain Frozen and Canned Warmwater Shrimp from the [PRC] at 55–56, A-570-893, (Nov. 29, 2004), available at https://enforcement.trade.gov/frn/summary/prc/04-26976-1.pdf (last visited Jan. 23, 2020).

[33] In Commerce's investigation of stainless steel sinks, Commerce, contrary to what the Department did here, treated itemized SG&A labor costs in the surrogate financial statements as a labor expense rather than an SG&A expense, when the data to value labor hours included total labor costs (e.g., manufacturing and SG&A), so to avoid double-counting.  See Stainless Steel Sinks IDM at 15.

statutory obligation to calculate dumping margins as accurately as possible.[34]  Cf. Labor

Methodologies, 76 Fed. Reg. at 36,094 (Commerce will remove disaggregated overhead

and SG&A labor line items from the surrogate financial statements that are already

included in the valuation of hours of labor.).

Commerce's determination cannot be sustained on this record.  On remand,

Commerce may wish to reopen the record.  However, Commerce should explain, in any

event, the basis for finding record evidence that allows it to conclude that it could capture,

and not overstate, labor costs by applying the NSO quarterly data and, as a result, decline

to adjust the surrogate financial ratios.[35]

---

[34] As further support for Commerce's decision to not "go behind" a surrogate financial statement of a company not party to the proceeding, Defendant refers to the Issues and Decision Memo. for the Admin. Review of [ADD] Order on Diamond Sawblades and Parts Thereof from the [PRC], A-570-900, (Feb. 8, 2013), available at https://enforcement.trade.gov/frn/summary/prc/2013-03481-1.pdf (last visited Jan. 23, 2020) ("DSBs Decision Memo.").  See Final Decision Memo. at 28.  In that administrative review on an ADD order on diamond sawblades, Commerce examined a surrogate company's financial statements "on their face" to determine whether to make certain adjustments for certain miscellaneous income.  See DSBs Decision Memo. at 34.  Although Commerce did not "go behind" the financial statements, it did make adjustments based on its analysis of relationships between activities that generated miscellaneous income and the general operations of the surrogate financial company.  Id.

[35] If Commerce fails "to consider or discuss record evidence, which, on its face, provides significant support for an alternative conclusion[,] [the Department's determination] is unsupported by substantial evidence."  Ceramark Tech., Inc. v. United States, 38 CIT __, __, 11 F. Supp. 3d 1317, 1323 (2014) (quoting Allegheny Ludlum Corp. v. United States, 24 CIT 452, 479, 112 F. Supp. 2d 1141, 1165 (2000)).  Although Commerce's "explanations do not have to be perfect, the path of Commerce's decision must be reasonably discernable to a reviewing court." NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319–20 (Fed. Cir. 2009) (citing Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

Court No. 15-00313                                                                 Page 25

**CONCLUSION**

For the reasons set forth above, the <u>Final Results</u> are sustained in part and remanded in part.  Accordingly, it is

**ORDERED** that Commerce's selection of Thailand as the primary surrogate country is sustained; and it is further

**ORDERED** that Commerce's selection of surrogate values for Plaintiffs' STR factor of production is sustained; and it is further

**ORDERED** that Commerce's calculation of Plaintiffs' surrogate financial ratios as related to labor is remanded for further explanation or reconsideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file their replies to comments on the remand redetermination.


                                                   /s/ Claire R. Kelly
                                                  Claire R. Kelly, Judge


Dated: January 29, 2020
         New York, New York